COURT OF APPEALS OF VIRGINIA

Present:  Judges Frank, Agee and Senior Judge Coleman


THOMAS L. SWITZER

v.   Record No. 0779-00-3

SAMUEL SMITH, JODY BOTKIN,
 WILLIAM SWITZER AND CARLEEN SWITZER          MEMORANDUM OPINION[*] BY
                                             JUDGE ROBERT P. FRANK
WILLIAM SWITZER AND CARLEEN SWITZER             JULY 31, 2001

v.   Record No. 1159-00-3

THOMAS SWITZER, PAULA SWITZER,
 SAMUEL SMITH AND JODY BOTKIN


              FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                     Thomas H. Wood, Judge

          Thomas L. Switzer, pro se.

          Charles E. Garner; Jeffrey A. Link;
          Deborah A. Gartzke, Guardian ad litem for the
          minor child (Blue Ridge Legal Services, Inc.,
          on brief), for appellees Samuel Smith, Jody
          Botkin and Paula Switzer.

          Roland S. Carlton, Jr. (Carlton & Titus,
          P.L.C., on brief), for William Switzer and
          Carleen Switzer.


     In Record Number 0779-00-3, Thomas L. Switzer (father)

appeals the decision of the trial court granting custody of his

minor child, Daniel Wayne Switzer (Daniel), to Samuel Smith

(Smith) and Jody Botkin (Botkin).  Proceeding pro se, father

---

     [*] Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

raises the following issues in his brief: 1) Smith and Botkin are not the most appropriate people to raise his child; 2) Code §§ 16.1-241(A) and 20-124.1 are unconstitutional; 3) the trial court did not have jurisdiction to award custody of the child to unrelated third parties absent initial intervention by the Department of Social Services; 4) the trial court's award was void ab initio; 5) Smith and Botkin did not have a valid custody petition; 6) the non-parent parties failed to overcome the natural parent presumption and failed to present sufficient evidence of actual harm; 7) he was denied due process; 8) he was denied equal protection under the law regarding visitation; and 9) he was denied his "fundamental right" to have counsel appointed by the trial court.

In Record Number 1159-00-3, William and Carleen Switzer (grandparents), father's parents and the paternal grandparents of the minor child, contend the trial court erred in: 1) finding that Smith and Botkin have standing to file petitions for custody "as persons with a legitimate interest"; 2) holding that Smith and Botkin had a valid petition for custody pending before the court; 3) holding that grandparents come before the court equally with nonrelatives in determining child custody; 4) determining that a parent is unfit for custody when no party has made such an allegation; and 5) finding that Code §§ 16.1-241, 16.1-278.15 and 20-124.1 are constitutional.

-

Upon reviewing the record and briefs of the parties, we conclude that these appeals are without merit. Accordingly, we affirm the trial court.

## I. BACKGROUND

This case has an extensive procedural history that culminated in the trial court awarding custody of Daniel to Smith and Botkin. In June 1999, the grandparents filed pretrial motions to vacate and dismiss the juvenile court's order, alleging lack of jurisdiction and lack of standing. Father joined in their motions. By letter opinion dated October 26, 1999, the trial court overruled the pretrial motions.

On November 29, 1999, the trial court heard de novo the petitions and cross-petitions filed by the parties. The record on appeal does not contain a transcript of the hearing, but it does include a written statement of facts signed by the trial judge. Father testified he attended anger management classes and that he and Paula Switzer, Daniel's mother, had committed acts of violence against each other. Father admitted he violated a juvenile court order by visiting Daniel at the grandparents' house before he finished anger management classes. Father indicated the grandparents had twice served him with "'no trespass papers.'"

Bonnie Shumaker, the Court Appointed Special Advocate (CASA) volunteer "responsible for this case since January of 1999," conducted twenty visits at the residence shared by Smith and Botkin. She also visited the grandparents' residence and father's

-

apartment.  Shumaker opined that Daniel "has been doing very well with" Smith and Botkin.  The trial court admitted into evidence CASA reports dated March 8, 1999 and August 4, 1999.  After the juvenile court hearing, grandmother "advised [Shumaker] not to visit [the grandparents'] mobile home any more and advised her, that, on the advice of counsel, she would not talk to [Shumaker] any more."

Penny Critzer, a licensed clinical social worker at the James Madison University Shenandoah Valley Child Development Clinic, interviewed all parties in the case and prepared a "comprehensive evaluation" of Daniel.  The forty-page evaluation was "based on an assessment of the child's needs, potential, developmental status and observed behavior" with the parties in the case.  The trial court made the report "part of the record."  Critzer opined that "Daniel got along much better with Smith and Botkin" and that, although the grandparents "love the child[, they] cannot set limits with him."  As a result, Critzer feared Daniel might develop a "reactive attachment disorder."  Critzer testified "there was an anxiety in the relationship between [Daniel] and [the grandparents] that was not present in the relationship between [Daniel] and Smith and Botkin."  Finally, Critzer "was concerned that [father] might hurt [the grandparents]."

Rebecca Prye, a part-time caseworker for the Valley Community Services Board, first worked with Paula Switzer when she was in a battered spouse shelter.  Prye helped Paula get temporary custody

-

of Daniel and "was involved in the temporary placement of Daniel with Smith and Botkin."  Prye explained that Paula suffers from "mental retardation and bipolar affective disorder."  Paula stays with a couple, Timothy and Vicki Banks, who provide foster care for adults.  Prye "testified that [Daniel] has flourished with Smith and Botkin."

Frances Clark operated the child care center that Daniel attended "during a substantial portion [of the time] that he has lived with Smith and Botkin."  Clark noticed that when Daniel returned on Monday after visiting the grandparents, he acted withdrawn and "lethargic" and "she had problems" with him.

Julia White, a worker with the LIFT program, a program designed to help "children under three who are developmentally delayed," stated that in January 1998, Daniel "was three to four months behind in his cognitive development and his speech.  With Smith and Botkin, [Daniel] caught up with respect to his cognitive development in less than a year."

Saundra Crawford, a probation officer with the juvenile court, conducted a custody investigation and prepared a report that she filed with the trial court.

Grandfather testified he does not have health or life insurance.  He described a physical altercation between himself and father in February 1999 when Daniel was visiting.

Magdelena Cequeda testified that father offered her and her children a place to live so he could "show everyone what a

-

responsible person he is."  After she moved in, they constantly fought and father assaulted her, even after he completed an anger management course.  Cequeda said father "was 'hard' on the children."  She described an incident in which father performed a sexually explicit act in front of her while her children were in the residence.

Botkin testified that she and Smith have lived together for four years.  "In December of 1997, Paula asked her and Smith to watch Daniel while [Paula] had surgery."  She and Smith "have had [Daniel] ever since."  Smith and Botkin work full-time for the same employer.  They both receive health and life insurance and are enrolled in an employer-sponsored 401K plan.

By letter dated December 23, 1999, the trial court awarded custody to Smith and Botkin "[a]fter carefully considering the evidence, the statute involved, Sections 20-124.1 through 20-124.3," the authorities cited and the arguments made by the parties.  The trial court indicated that a detailed letter opinion explaining its decision would be forthcoming.

On January 6, 2000, the trial court issued a letter opinion confirming the ruling made in its December 23, 1999 letter.  The trial court discussed the "'primacy of the parent-child relationship'" and acknowledged that Code § 20-124.2 "gives rise to a presumption that the child's best interests will be served when in custody of its parents."  However, it also explained that in all child custody cases, "'the best interests of the child are

-

paramount . . . .'"  The trial court "afforded to [father] a presumption that the best interests of [Daniel] would be served by awarding [his] custody to him," and it "imposed upon Smith/Botkin the burden of proving by clear and convincing evidence that the best interests of [Daniel] dictated that [his] custody be awarded to someone other than [father]."  The trial court recalled the great amount of evidence establishing how well Daniel was progressing in Smith and Botkin's custody.

The trial court noted that father "suffers from depression and an anxiety disorder, and has been diagnosed with a schizoid personality disorder . . . ."  The trial court found that father is unable "to hold any job for any length of time and his relationships with all people around him are marked by violence."  The court further explained that father "has deep-seated and complex mental and emotional problems which cannot be resolved by a mere anger management course."  The court further stated that father "lacks the ability to control his conduct" and "to care for a three-year-old child."

The trial court found that father and the grandparents "do not like each other."  In fact, "[t]his animosity surfaced in the Courtroom during the course of the trial and has been well documented by every individual who has studied this family."  Despite this antagonism, the court noted that father has frequent contact with his parents and regularly eats meals with them.  "After considering all the evidence in this case," the trial court

-

found that the grandparents "lack the ability to successfully raise this child." The court wrote, "That lack of ability, coupled with the problems presented by [their] adult, retarded daughter, Tressa, and the frequent contact with [father] absolutely dictate that the custody of this child not be awarded to them."

The trial court acknowledged it was troubled by the fact that Smith and Botkin, though indicating an intention to marry after the case was over, lived together "without benefit of marriage." However, the court noted that the guardian ad litem, the CASA volunteer, and the clinical social worker all recommended that custody be awarded to Smith and Botkin. The trial court concluded as follows:

> After considering all of the evidence, all of the statutory provisions, particularly the factors to be considered by the Court in determining the best interests of the child as set forth in Section 20-124.3, the Court is convinced that the custody of this child ought to be awarded to Samuel Smith and Jody Botkin. Not only do they have youth, intelligence and good health, they also love this child very deeply. They very clearly represent the best option to the Court in this case.

The trial court entered a final order on March 7, 2000 in which it summarized all of its rulings.

## II. ANALYSIS

We first address father's contention that Smith, Botkin and Daniel's maternal grandmother, Edith Fridley, who lives with

-

Smith and Botkin, are materially and morally unfit to care for Daniel.[1] Specifically, father contends Smith and Botkin are first cousins "who live together in open fornication."

> "In matters of custody, visitation, and related child care issues, the court's paramount concern is always the best interests of the child." Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990). "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. at 328, 387 S.E.2d at 795 (citing Eichelberger v. Eichelberger, 2 Va. App. 409, 412, 345 S.E.2d 10, 12 (1986)). "A trial court's determination of matters within its discretion is reversible on appeal only for an abuse of that discretion . . . and a trial court's decision will not be set aside unless plainly wrong or without evidence to support it." Id. (citations omitted).

Goldhamer v. Cohen, 31 Va. App. 728, 734-35, 525 S.E.2d 599, 602 (2000).

We will not again recite the evidence before the trial court, nor the trial court's finding of father's unfitness. The trial court heard testimony and weighed it accordingly.

In addition to testimony from witnesses and the parties, the trial court possessed extensive evidence from experts in the form of reports, observations and recommendations, all of which

---

[1] Father failed to include this issue in his questions presented, but addresses it in the "Facts and Argument" section of his brief. Because he contested the trial court's decision to award custody to Smith and Botkin, we will address this argument.

-

supported its decision to award custody to Smith and Botkin. After reviewing the record, we cannot say that the trial court's decision was plainly wrong or without evidence to support it.

We next address father's contention that Code §§ 16.1-241(A) and 20-124.1[2] are unconstitutional because they allow "non-parent parties to petition and win custody of a child." He also claims the "legislature without due process of law has given the protected rights of parents and other close relatives of children to anyone who wants them."

Code § 16.1-241(A)(3) grants jurisdiction to juvenile courts in all cases, matters and proceedings involving the "custody, visitation, support, control or disposition of a child . . . [w]hose custody, visitation or support is a subject of controversy or requires determination."

The statute further provides:

> The authority of the juvenile court to adjudicate matters involving the custody, visitation, support, control or disposition of a child shall not be limited to the consideration of petitions filed by a mother, father or legal guardian but shall include petitions filed at any time by any party with a legitimate interest therein. A party with a legitimate interest shall be broadly construed and shall include, but not

_____

[2] Code § 20-124.1 simply defines "persons with a legitimate interest." Father makes no argument that the definition is unconstitutional. We, therefore, only address the constitutionality of Code § 16.1-241. Further, father did not challenge the constitutionality of Code § 20-124.2, which allows the court to give custody to "any other person with a legitimate interest."

-

> be limited to, grandparents, stepparents,
> former stepparents, blood relatives and
> family members.

Code § 16.1-241.

Father relies on Williams v. Williams, 256 Va. 19, 501 S.E.2d 417 (1998), in support of his argument that the trial court had no jurisdiction to award custody to "any party with a legitimate interest."  Father's reliance on Williams is misplaced.

Williams involved court-ordered visitation for the grandparents pursuant to Code § 20-124.2 over both parents' objections.  See Williams, 256 Va. at 20, 501 S.E.2d at 417. The Supreme Court upheld this Court's decision that Code § 20-124.2 did not unconstitutionally interfere with the rights of parents in raising their child, writing:

> [T]he right of parents in raising their
> child is a fundamental right protected by
> the Fourteenth Amendment. . . .  [S]tate
> interference with a fundamental right must
> be justified by a compelling state interest,
> and that to constitute a compelling
> interest, "state interference with a
> parent's right to raise his or her child
> must be for the purpose of protecting the
> child's health or welfare."

Id. at 21, 501 S.E.2d at 418 (citations omitted).

The Supreme Court further wrote:

> The Court of Appeals then interpreted
> Code § 20-124.2(B) to permit the state to
> interfere with the right of parents to raise
> their child by allowing a court to order
> nonparent visitation upon a showing by clear
> and convincing evidence that the best

-

interests of the child would be served by such visitation. [Williams v. Williams, 24 Va. App. 778,] 784, 485 S.E.2d [651,] 654 [(1997)]. However, the Court of Appeals said that the language in the foregoing statute that a court "shall give due regard to the primacy of the parent-child relationship," evinces the General Assembly's intent to require the court to find that a denial of nonparent visitation would be detrimental to the child's welfare before the court may interfere with the constitutionally protected parental rights. Id.

In other words, the Court of Appeals said, "For the constitutional requirement to be satisfied, before visitation can be ordered over the objection of the child's parents, a court must find an actual harm to the child's health or welfare without such visitation." Id. at 784-85, 485 S.E.2d at 654. A court reaches consideration of the "best interests" standard in determining visitation only after it finds harm if visitation is not ordered. Id. at 785, 485 S.E.2d at 654.

Id. at 21-22, 501 S.E.2d at 418.

In Troxel v. Granville, 530 U.S. 57 (2000), the United States Supreme Court held that a Washington statute was unconstitutional as violative of a mother's substantive due process rights because it placed no limits on who could petition for visitation or the circumstances under which the petition could be granted. The Supreme Court held that the mother, who was a "fit parent," had the absolute right to control the visitation of her children. See id. at 68-69.

-

The Court wrote:

> First, the Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children. As this Court explained in Parham[v. J.R., 442 U.S. 584, 99 S. Ct. 2493, 61 L.Ed.2d 101 (1979)]:

> "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." 442 U.S., at 602, 99 S. Ct. 2493 (alteration in original) (internal quotation marks and citations omitted).

> Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. See, e.g., [Reno v.] Flores, 507 U.S. [292,] 304, 113 S. Ct. 1439[, 123 L.Ed.2d 1 (1993)].

Id.

In Bottoms v. Bottoms, 249 Va. 410, 457 S.E.2d 102 (1995), the Supreme Court of Virginia held:

> "In all child custody cases, including those between a parent and a non-parent,

-

'the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute.'" Bailes v. Sours, 231 Va. 96, 99, 340 S.E.2d 824, 826 (1986) (quoting Walker v. Brooks, 203 Va. 417, 421, 124 S.E.2d 195, 198 (1962)). In a custody dispute between a parent and non-parent, "the law presumes that the child's best interests will be served when in the custody of its parent." Judd v. Van Horn, 195 Va. 988, 996, 81 S.E.2d 432, 436 (1954).

Although the presumption favoring a parent over a non-parent is strong, it is rebutted when certain factors, such as parental unfitness, are established by clear and convincing evidence. Bailes, 231 Va. at 100, 340 S.E.2d at 827. . . .

In custody cases, the welfare of the child takes precedence over the rights of the parent. Malpass v. Morgan, 213 Va. 393, 399, 192 S.E.2d 794, 799 (1972). But, when the contest is between parent and non-parent, this rule is conditioned upon the principle that a parent's rights "are to be respected if at all consonant with the best interests of the child." Id. at 400, 192 S.E.2d at 799. Some of the foregoing principles have been codified recently by the General Assembly in Code §§ 20-124.1 to -124.6. Acts 1994, ch. 769. . . .

* * * * * * *

Among the factors to be weighed in determining unfitness are the parent's misconduct that affects the child, neglect of the child, and a demonstrated unwillingness and inability to promote the emotional and physical well-being of the child. Other important considerations include the nature of the home environment and moral climate in which the child is to be raised. Brown v. Brown, 218 Va. 196, 199, 237 S.E.2d 89, 91 (1977).

Id. at 413-19, 457 S.E.2d at 104-07.

-

In this case, the trial court recognized the primacy of the parent-child relationship.  The trial judge, in his opinion letter, set forth his factual findings and concluded father was unfit.  Implicit in the court's ruling was that the child would be subjected to conduct that would harm the child.  Other evidence before the trial court supports the finding.  We see no need to repeat that evidence.

The trial court also found that it was in the child's best interest to award custody to Smith and Botkin.  The evidence clearly supports that conclusion as well.

Because there is sufficient evidence to show father is unfit, there is a compelling "state interest" for the court to award custody to a non-parent.  The child's health and welfare are at stake.  Father, therefore, was not deprived of substantive due process and Code § 16.1-241 is not unconstitutional.  We, therefore, hold that the trial court did not err.

Father also contends the trial court did not have jurisdiction to award Smith and Botkin custody of the minor child.  He contends the judgment "joining Smith/Botkin as parties, recognizing them as having a legitimate interest in [his] child, and awarding . . . custody to them [is] void ab initio under constitutional law."

-

As explained above, we upheld the trial court's ruling that the custody and visitation statutes are constitutional. That analysis disposes of this issue.

We next address father's contention that the non-parent parties failed to overcome the natural parent presumption and failed to present sufficient evidence of actual harm. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) (citing Jacques v. Commonwealth, 12 Va. App. 591, 593, 405 S.E.2d 630, 631 (1991) (citing Rule 5A:18)).

Upon our review of the record, appellant first raised this argument in his notice of appeal, which was filed on April 4, 2000. Listing an issue in a notice of appeal does not properly bring the issue to the trial court's attention or preserve the issue for appeal. See Rule 5A:18. Accordingly, Rule 5A:18 bars our consideration of this question on appeal. Moreover, the record does not reflect any reason to invoke the good cause or ends of justice exceptions. See id.

Father next contends he was denied due process. He argues that his visitation was changed by the grandparents without "trial or notice" and that he has "had only two or three unsupervised visits with" his son. He also contends he was denied due process when "Smith/Botkin took [his] child without trial or notice, [and] again when Smith/Botkin refused to allow

-

[him] any more visitation without trial or notice, again in JDR Court, and finally in Circuit Court."  In his written closing argument, filed on December 14, 1999, father wrote, "Also, others involved have already admitted denying my rights to my son without due process (i.e., changes in custody and visitation without my knowledge or consent or my day in court!").

> "The Fourteenth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law." Jackson v. W., 14 Va. App. 391, 405, 419 S.E.2d 385, 393 (1992).  "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."  Carey v. Piphus, 435 U.S. 247, 259, 98 S. Ct. 1042, 1050, 55 L.Ed.2d 252 (1978).

O'Banion v. Commonwealth, 33 Va. App. 47, 61, 531 S.E.2d 599, 606 (2000) (en banc).  In order to implicate the Due Process Clause of the Fourteenth Amendment, there must be state action.  See Miller v. Commonwealth, 25 Va. App. 727, 739, 492 S.E.2d 482, 488 (1997).

Here, the visitation and placement of the child until the trial court ruled on the matter did not involve state action and was, therefore, not a violation of due process.  Moreover, the record shows that father received notice of all pleadings and court hearings.  Finally, the statement of facts indicates that "[father] has been present in court when the custody order and visitation orders have been entered, but he refuses to endorse

-

any order."  Accordingly, the record fails to show father was denied due process as a result of state action.

Father contends he was denied equal protection in violation of the Fourteenth Amendment because "in custody cases fathers are not treated the same as mothers."  He argues, "Paula, despite her apparent limitations, has been given more liberal visitation and the chance to care for my child (albeit under the supervision of others), which I haven't."

"The Court of Appeals will not consider an argument on appeal which was not presented to the trial court."  Ohree, 26 Va. App. at 308, 494 S.E.2d at 488 (citing Jacques, 12 Va. App. at 593, 405 S.E.2d at 631 (citing Rule 5A:18)).

The record fails to show that appellant made an equal protection argument to the trial court regarding visitation. See Rule 5A:18.  Accordingly, Rule 5A:18 bars our consideration of this question on appeal.  Moreover, the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.  See id.

Father argues he was denied his "fundamental right" to counsel because the trial court did not appoint counsel for him. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court."  Ohree, 26 Va. App. at 308, 494 S.E.2d at 488 (citing Jacques, 12 Va. App. at 593, 405 S.E.2d at 631 (citing Rule 5A:18)).

-

The record does not establish that father ever requested or was denied court-appointed counsel.  See Rule 5A:18. Accordingly, Rule 5A:18 bars our consideration of this question on appeal.  Moreover, because the right to court-appointed counsel does not extend to civil domestic cases of divorce and child custody, see M.L.B. v. S.L.J., 519 U.S. 102, 123 (1996) ("[C]ounsel at state expense . . . is a constitutional requirement . . . only when the defendant faces time in confinement."), the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.  See Rule 5A:18.

We now address the grandparents' arguments.  First, the grandparents contend that Smith and Botkin were not persons with a legitimate interest under Code §§ 16.1-241, 16.1-278.15 and 20-124.1.

Code § 20-124.1 does not specifically define a "person with a legitimate interest" but requires that the term be "broadly construed to accommodate the best interest of the child."  Code § 20-124.1.  However, we addressed "a party with a legitimate interest" in a standing context in Thrift v. Baldwin, 23 Va. App. 18, 473 S.E.2d 715 (1996).

In Thrift, three of the five Thrift children were adopted by the Baldwins.  See Thrift, 23 Va. App. at 19, 473 S.E.2d at 715.  The children's paternal grandparents adopted one of the five children.  See id.  Subsequently, the paternal grandparents

-

and the child they adopted petitioned for visitation of the three children adopted by the Baldwins.  See id.  In finding that the paternal grandparents had standing to petition for visitation, we held:

> The statute enjoins a broad construction of the term "[a] party with a legitimate interest."  We hold that this term means not only a party possessed of legal rights with respect to the child, but also any party having a cognizable and reasonable interest in maintaining a close relationship with the child.  The statute expressly provides that the term shall include "grandparents and other blood relatives."  Although the adoption of the children by the Baldwins extinguished the Thrifts' legal grandparental and sibling relationship, see Code § 63.1-233; see also Cage v. Harrisonburg Dep't of Social Services, 13 Va. App. 246, 410 S.E.2d 405 (1991), the blood relationship continues. Code § 16.1-241(A) expressly confers standing to seek visitation.

Id. at 20, 473 S.E.2d at 716.

Therefore, we review the facts to determine whether Smith and Botkin had a "cognizable and reasonable interest" in maintaining a close relationship with the child.

Thomas and Paula Switzer were married on June 12, 1993 and separated for the last time in October 1997, after a marriage marred by repeated incidents of abuse of Paula by Thomas.  Upon separation, Paula spent almost two months in an emergency battered spouse shelter with the child.  Smith and Botkin agreed to care for the child in January 1998, and he has been in their custody since that time.  At the time of the de novo hearing in

-

circuit court on November 29, 1999, the child had been living with them for almost two years.

Evidence further indicated that the child is flourishing under the care of Smith and Botkin.  We agree with the trial court's finding that Smith and Botkin are "persons with a legitimate interest."  The evidence clearly indicates that they have a close relationship with the child and a reasonable interest in maintaining that relationship.  The trial court did not err in finding that Smith and Botkin were "persons with a legitimate interest."

Both the grandparents and father contend that because Smith and Botkin asked the court to withdraw their custody petition, there was no valid custody petition pending to enable the trial court to award them custody.

We address this argument as put forth in the brief of the grandparents because father indicated his intention to rely on their arguments.  In his pretrial motion to dismiss, he failed to independently argue the issue.

On February 24, 1998, Smith and Botkin filed a petition in the juvenile court for the court to determine custody of the child.  They indicated that Paula left the child in their care on January 6, 1998, and they requested custody.  On August 10, 1998, the guardian ad litem for the child moved the juvenile court to "consolidate [Smith and Botkin's] petition for custody," "make [them] parties in this matter," and order

-

"temporary custody to" Smith and Botkin "pending a full custody hearing."

On September 14, 1998, the juvenile court found that "the best interest of [the] child" would be best served by "preserving the status quo."  It then ordered that the child "temporarily remain in the care of" Smith and Botkin.

On February 24, 1999, Smith and Botkin filed a letter with the juvenile court indicating they "[would] no longer be pursuing [their] petition for custody."  They expressed dissatisfaction with the way in which the parties have acted and agreed with the CASA recommendation that the child be put up for an open adoption.  The record contains no documentation that Smith and Botkin followed up on their request, nor is there an order in the record granting the request to withdraw their petition.  To the contrary, subsequent to the letter, they participated in the custody proceeding and were awarded custody. The juvenile court conducted a hearing on April 14, 1999.  On May 4, 1999, the juvenile court awarded Smith and Botkin legal and physical custody of Daniel and denied the custody petitions of father and the grandparents.  Paula's petition for custody "was voluntarily withdrawn" prior to the hearing.

In its August 26, 1999 opinion letter, the trial court wrote:

> There is no question but that Samuel Smith
> and Judy Botkin filed a Petition for
> Custody.  There is no question but they sent

-

> a letter to the court indicating they did not intend to pursue that petition. However, there is no order in the file dismissing the petition or indicating that the court ever took any action on the letter.

We agree with the trial court's ruling that "the petition was still pending and validly before the court at the time of the April 14, 1999 trial." The petition had not been dismissed and removed from the docket. There was no order removing the case from the docket. "A court speaks only through its orders." Cunningham v. Smith, 205 Va. 205, 208, 135 S.E.2d 770, 773 (1964). Accordingly, the trial court did not commit reversible error.

The grandparents next contend the trial court erred in treating grandparents and non-relatives equally in a custody determination. They cite no cases, nor do we find any, to support their position. While acknowledging this issue is a matter of first impression in Virginia, they cite no case from any other state.

The grandparents rely on Code § 16.1-283(A), which requires that the court, in cases involving the termination of residual parental rights, "shall give a consideration to granting custody to relatives of the child, including grandparents." This reference is not persuasive.

"The termination of parental rights is a grave, drastic, and irreversible action. When a court orders termination of

-

parental rights, the ties between the parent and child are severed forever, and the parent becomes 'a legal stranger to the child.'"  Lowe v. Dep't of Public Welfare of City of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986) (quoting Shank v. Dep't Social Services, 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976)).

The very nature of a custody proceeding is quite different than termination because parental rights are not lost and custody is subject to modification upon "'a material change in circumstances justifying a modification of the decree.'"  Ohlen v. Shively, 16 Va. App. 419, 424, 430 S.E.2d 559, 561 (1993) (quoting Yohay v. Ryan, 4 Va. App. 559, 565-66, 359 S.E.2d 320, 324 (1987)).  Therefore, we hold the language, relied upon by the grandparents, in Code § 16.1-283(A) is limited to a termination proceeding.

Further, the argument that relatives be granted preference in a custody context belies the unambiguous language of Code § 20-124.1.

> "Where a statute is unambiguous, the plain meaning is to be accepted without resort to the rules of statutory interpretation." Last v. Virginia State Bd. of Med., 14 Va. App. 906, 910, 421 S.E.2d 201, 205 (1992).  "'Courts are not permitted to rewrite statutes.  This is a legislative function.  The manifest intention of the legislature, clearly disclosed by its language, must be applied.'" Barr v. Town & Country Properties, Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting Anderson v. Commonwealth, 182 Va. 560, 566, 29 S.E.2d

-

838, 841 (1944)).  Accordingly, we must
"'take the words as written'" in Code
§ [20-124.1] and give them their plain
meaning.  Adkins v. Commonwealth, 27 Va.
App. 166, 169, 497 S.E.2d 896, 897 (1998)
(quoting Birdsong Peanut Co. v. Cowling, 8
Va. App. 274, 277, 381 S.E.2d 24, 26
(1989)).

Krampen v. Commonwealth, 29 Va. App. 163, 168, 510 S.E.2d 276,

278 (1999).

In Code § 20-124.2(B), the legislature expressed its

intention that a trial court "give due regard to the primacy of

the parent-child relationship . . . ."  However, that same code

section authorizes the trial court to "award custody or

visitation to any other person with a legitimate interest" "upon

a showing by clear and convincing evidence that the best

interest of the child would be served thereby."  Code

§ 20-124.2(B).

Code § 20-124.1 provides:

"Person with a legitimate interest" shall be
broadly construed and includes, but is not
limited to grandparents, stepparents, former
stepparents, blood relatives and family
members provided any such party has
intervened in the suit or is otherwise
properly before the court.  The term shall
be broadly construed to accommodate the best
interest of the child.

By expressly distinguishing parents from non-parents and by

including relatives and non-relatives as persons with a

legitimate interest, the legislature evinced its desire that all

-

non-parents, whether relatives or not, come before the court equally.  Accordingly, the trial court did not err in so ruling.

Finally, we address the grandparents' constitutional arguments.  First, they contend the trial court violated the Due Process Clause of the Fourteenth Amendment when it held that father was unfit, there being no allegation of unfitness in the written petition.  They maintain that the initial pleading, the petition for custody, was deficient in that it did not sufficiently put father on notice that he would need to defend himself against allegations of unfitness.  Next, they challenge the constitutionality of Code §§ 16.1-241, 16.1-278.15 and 20-124.1.  They challenge the concept in these statutes that "any party with a legitimate interest" may file a petition for custody.  They assert that parents have a "liberty interest, their right to raise their children."

We do not address the merits of these contentions because the grandparents are asserting the constitutional rights of another.

> [W]e note that generally, a litigant may challenge the constitutionality of a law only as it applies to him or her. Grosso v. Commonwealth, 177 Va. 830, 839, 13 S.E.2d 285, 288 (1941).  That the statute may apply unconstitutionally to another is irrelevant; one cannot raise third party rights.  An exception to this rule is in the area of first amendment challenges. Broadrick v. Oklahoma, 413 U.S. 601, 611-12, 93 S. Ct. 2908, 2915-16, 37 L.Ed.2d 830 (1973).

-

Coleman v. City of Richmond, 5 Va. App. 459, 463, 364 S.E.2d 239, 241-42 (1988).

In Wright v. Alexandria Div. of Social Services, 16 Va. App. 821, 433 S.E.2d 500 (1993), we held that a child has standing to raise the issue of whether her mother's constitutional rights were violated in a termination of parental rights case.

We wrote:

> A party has standing in a case if he or she "allege[s] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 72, 98 S. Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (quoted in Cupp v. Board of Supervisors, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984)) (emphasis added in Cupp).
>
> In cases involving parental rights, the rights of the child coexist and are intertwined with those of the parent.  The legal disposition of the parent's rights with respect to the child necessarily affects and alters the rights of the child with respect to his or her parent.  Boronica Wright has a "personal stake in the outcome" of the proceeding to terminate her mother's parental rights and, therefore, has standing to challenge the propriety of the trial judge's decision to terminate those rights.

Id. at 825, 433 S.E.2d at 502-03.

In the present case, the rights of the grandparents and those of father do not co-exist and are not intertwined.  To

-

some extent, their interests were adverse because each sought custody of the child.

By law, their interests are not co-extensive. Grandparents are not entitled to visitation over the parent's objection unless the court finds "'actual harm to the child's health or welfare without such visitation.'" <u>Williams</u>, 256 Va. at 22, 501 S.E.2d at 418.

In <u>Troxel</u>, 530 U.S. at 68-69, the United States Supreme Court held that a Washington state statute was unconstitutional because it infringed on the mother's fundamental right to make decisions concerning the care, custody and control of her children by granting the grandparents more visitation than was agreeable to the mother.

We, therefore, conclude that the grandparents have no standing to complain of constitutional violations of father's rights.

For these reasons, we find the trial court did not err in awarding custody to Smith and Botkin. We, therefore, affirm the judgment of the trial court.

<u>Affirmed.</u>

-